Thank you your honor and I'd like to reserve three minutes for rebuttal if I might. I will do that your honor. Thank you. The court should stay the District Court's preliminary injunction here first and foremost because there is no legal basis to justify granting self-identified journalists and legal observers a special exemption under the First Amendment from lawful dispersal orders. Moreover the injunction's broad and vague criteria for what qualifies as a self-identified journalist or legal observer is unworkable on the ground and in fact as our declaration shows has provided cover for violent opportunists posing as journalists to attack federal property and personnel and that leaves officers with an untenable choice which is to risk their safety or risk contempt. Neither plaintiffs nor the District Court cite any precedent for this kind of broad judicial ex-ante management of law enforcement responses to violent and unpredictable situations and we don't think this should be the first injunction of its kind and so we urge that it should stay pending appeal. Now let me start with the merits. There's no First Amendment special right of journalists to disobey dispersal orders that everyone else has to follow. The Supreme Court has made that clear in cases like Brandsburg. This court has made that clear in cases like California First Amendment Coalition and the premise of the injunction on its face though is that anyone who self-identifies as a journalist or legal observer can disobey dispersal orders and is immune from arrest for disobeying dispersal orders that everyone else needs to follow. Counsel, that argument, counsel if I might, that that argument is premised on the assumption that a lawful dispersal order has been issued of course and the Constitution preserves the general police powers to the states. So I have a couple of follow-up questions along these lines. Is it, first is it 1315 that the federal government is relying on for as authority to issue a dispersal order on federal property, is that right? For the DHS officers, that's correct. I believe the US Marshals Service, which protects courthouse and court personnel as you know, also has powers under I think it's section 566 of Title 28. But yes, 1315 is the principal authority for the DHS officers here. So in this briefing I thought it was a little unclear whether the federal defendants are taking the position that they have the authority to issue dispersal orders on the street or sidewalk. So we believe, and there's been no allegations in this case or in the record, that federal officers have issued dispersal orders from just wandering the streets of Portland. I think in every one of these cases, federal officers have started their activities on federal property and then pursuant to 1315 have attempted to enforce their orders to protect federal property and personnel to the extent necessary to protect it. So you know, on the street outside and moving to the park across the street from the courthouse, but with that nexus to the federal property and persons on the property. Okay, I think the way you just answered my question, I'm not trying to split hairs, but I think the way you just answered my question talked about retrospectively as a matter of finding a fact what has happened in the past. My question is just a little different. Is it the federal government's, forgive me, the federal defendants position today that they have the authority to issue just general dispersal orders off federal property? So again, I don't mean to dodge the question, but you know the full extent of federal authority is not in this case. I think they certainly have the authority to issue dispersal orders on federal property and then to effectuate it off to the extent necessary to protect the federal property. And that's all that's at issue in this case. And so I think that's all that this court needs to consider for this particular case. Council, I have a question. I'm sorry, Judge Rawlinson, you may go ahead. No, go ahead. Oh, I was just going to follow up on that last exchange. The record in the case shows that additional federal law enforcement agents were deployed to Portland on July 3rd, and then they were replaced by state police on July 29th. What is the status of those federal agents today? So I don't think it's a matter in the record or a public record. I do know that state officers on July 29th initially took over protection and then that eventually they handed over to city of Portland officers. And my understanding is that the city of Portland officers have since that time largely been responsible for the protection of federal property in Portland since the end of the injunction does not appear to be geographically limited. Should we be considering this as a universal or nationwide injunction? Did the district court make any findings that would fund the Hatfield Courthouse? So certainly, as your honor pointed out, the injunction itself is silent. There are no findings, to my knowledge, in the record that would support a nationwide injunction, certainly. And I think we at least have interpreted it as applying only to the specific protests going on in the Portland, Oregon area. Okay. And I don't think plaintiffs have suggested that it's broader than that. Counsel, if state officers have taken over this responsibility, does that render this case moved? No, I don't believe so, your honor. I think that would be a basis to stay or even summarily vacate the injunction. Obviously, injunctive relief is not appropriate if there's no impending harm. And I do have to say on the flip side, though, there is irreparable harm on the government because every time a federal officer leaves a federal building and encounters someone on the streets of Portland, this injunction is currently hanging over their head. And every interaction comes with an untenable choice, which is they have to risk their safety or risk contempt. So as long as this injunction is hanging over the heads of officers, it imposes irreparable harm. But on the flip side, as your honor suggested, you know, if you think that there's, you know, not much risk of future interaction, then that would actually support summarily vacating the injunction and certainly would support staying it. Counsel, your last comment about risking contempt, paragraph six of the order says that the federal defendant shall not be liable for violating this injunction if a journalist or legal observer is incidentally exposed to with the choice that you've just identified. So I think it might be most helpful, your honor, if I could explain it by way of an illustration or a hypothetical. And this is supported by the declarations we put in the record of what's actually happening on the ground. So it's not really that hypothetical. But, you know, let's say you're an officer on the ground. A crowd has turned violent. It's an unlawful assembly. You know, it's nighttime. You've got goggles on. You can't see very well. There's smoke. There's fire. You're trying to clear an area. You encounter a crowd and someone says, I'm a journalist in the crowd, or you see a crowd and you think the safest way to disperse this crowd right now is something like, say, a gas canister, which can disperse the crowd without like personal interaction, having to go into the crowd with batons or weapons and expose yourself to harm and expose them to person in the crowd. All of a sudden, that method that the officers determined based on training might be the safest way to clear the crowd is off the table because that would no longer be incidental. The officer knows that there's a press person in the crowd and would be directing a gas canister to that crowd. So all of a sudden now he has to choose maybe a less safe option. Or let's say the officer encounters a crowd of people and trying to inspect with this vague criteria, which of them are journalists or wearing a blue vest or whatever, and which ones are not trying to sort the sheep from the goats. And then everybody in the crowd pipes up and says, I'm a journalist. At that point, you're an officer. What do you do, right? You can try and clear them if you don't see the indicia. But if it later turns out they are journalists, then probably in a contempt proceeding, they'll say, well, of course the officer knew or had reason to know, and it wasn't incidental. I told him I was a journalist, and nevertheless, he told me to leave. The order of paragraph six counsel. Forgive me? Yeah. I'm just not sure you're answering my question. The order of paragraph six says the federal defendants are not precluded from issuing any otherwise lawful crowd control dispersal orders for a variety of lawful reasons. Federal defendants shall not be liable for violating this injunction if a journalist or legal are remaining in the area where such devices are deployed after the issuance of such a lawful dispersal order. So it seems to me if folks... And we have lots and lots of examples that were captured on film and in declarations that the district court in its fact finding capacity found to be credible about these examples where people were injured, standing completely away from the protesters. But I think your example is the one that is important to think about is, what if these observers and members of the public are wrinkled? And to that point, it seems to me that this paragraph six makes very clear that if they choose to remain in a wrinkle, they're in harm's way, and that the federal defendants won't be in violation of this injunction if they get hurt in the meantime, sir. Again, as I said, Your Honor, I think it's unworkable because federal defendants have to decide whether anyone they encounter is or isn't a victim of a dispersal order after an assembly is turned violent is to clear the area of everybody and not to leave people behind. And if you're at risk, and if there are violent opportunists who are posing as journalists or legal observers, the problem for police is they have to make a split second decision. Do they clear them out of the area because they don't think they're... They think they're faking or something like that? Or do they turn their back on them because they have the indicia of journalists? And at that point, they're placing themselves at risk. But... May I follow up, please, quickly there on two other points? It's important to get your responses. It seems to me, regardless of what people are wearing or how they're marked, this order is clear that if there's probable cause to believe that they have committed a crime, they can be arrested. Do you agree with that? After probable cause exists, certainly yes. Although, again, to respond to that, the biggest problem is that this injunction hanging over the head of officers forces them to make a split second decision. If someone just claims they are a journalist and hasn't actually done anything yet, the officer who turns his back on that person because he can't disperse them, all of a sudden has put his safety at risk if it turns out that that person is not actually a law abiding journalist, but in fact, a violent opportunist. That's the problem. And I appreciate that plaintiffs have put in declarations and the judge found them credible, but at most, that just maybe would establish that there are rogue officers who don't follow the written policy of the agency. It wouldn't support this injunction that's a sort of unprecedented broad judicial ex ante management of how law enforcement is supposed to respond to violent and unpredictable situations on the ground. But we don't think this should be the first. I didn't mean to cut you off. Forgive me. You don't think it should be the first injunction, is that... Yes? That's right. And at a minimum, even if the court were to disagree, we would at a minimum say, because of its unprecedented nature, at a minimum, a stay should be continued until the injunction itself can be briefed on the merits of the appeal and any further appellate proceedings. I only have two other questions, and I'm sorry, it's a little hard to do this virtually, and it's tougher with you telephonically, because I can't see, so forgive me if I've interrupted you. I only have two more questions for you, sir. One is that the district court had testimony from plaintiff's expert, and you're familiar with his qualifications. He opined that this order is my question is whether or not you're taking issue with that finding or claiming that any of the court's findings of fact are clearly erroneous. So we do take issue with that one, in particular, on workability, because first and foremost, we think that the... Mr. Perlikowski, I think is his name. It's an expert opinion, of course, and like all expert opinions, it's only as good as the factual premises on which it's based. And as he says in his declaration, and I'm looking here at mostly paragraph 12 to 15, he hasn't seen any evidence of any incident where someone's pretending to be a journalist, enabled harm, no reported instance of anyone disguising themselves as press to get behind officer lines. And then his own experience, he says in his hundreds of protests, he never recalls any instance where someone pretended to be media to get behind lines. And so I think the differences in this case, we have declarants from our officers on the ground in Portland saying all of these things are in fact happening. So just as this is not necessarily a clear error issue, it's a legal question of relevance. This expert's opinion is simply based on experience and facts that are not present in Portland, as I think the unrebutted facts show that there are violent opportunists who are hiding behind and pretending to be press to take advantage of this injunction in TRO before. And my final question, sir, on that point, my final question has to do with, you've argued repeatedly that this is unworkable and the district court found otherwise, of course, for some of the reasons we've already discussed. But you also principally relied on the fact that the city of Portland Police Department has not found it unworkable. They're operating  Yes. So first of all, the city did come back to the government and say that they were seeing problems with it. And, you know, I'm on page 44 of the court's opinion. You know, the court said at first when the city of Portland agreed to it, that was evidence of workability. And then in a footnote said, Oh, but when the city, the city comes back in the future and says, you know, they need modifications that won't be evidence of unworkability. So it's sort of a ratchet there. And in any event, I think the city of Portland and maybe the state of Oregon, you know, they might have different considerations and different policy views about why they might want to agree to the injunction or why they think policing ought to be conducted in one fashion versus the other. My understanding from news reports is that very recently the Portland mayor, who I believe is also a police commissioner there or the head of police there decided that Portland police will no longer use gas to clear protest crowds. That's a policy judgment. And the fact that the city of Portland is willing to tolerate conditions on their law enforcement and expose have a different, you know, risk balancing for their law enforcement doesn't bind the federal government and doesn't change the fact that this injunction is hanging over the heads of federal officers with every interaction they have. Unless there are further questions, I'd like to reserve. Any further questions? If not, you may reserve your three minutes and 21 seconds. Judge Rawlinson, did you have a question? I'm sorry. No, I didn't. Oh, very well. Then we will call on counsel for index newspapers. Mr. Borden. Mr. Borden, your audio is not coming through. Is your microphone on? Sorry. Good afternoon, your honors. Good afternoon. Now we can hear you. May it please the court. My name is Matt Borden of Bromhage and Borden, and I represent the appellees. The district court's order here is workable. It's based on extensive factual findings. It protects the critical right of the press to report on these protests. And at the same time, it protects legitimate law enforcement interests. The government is seeking an extraordinary relief in staying this order. And to do so, it must prove all four of the factors, and it can't prove any. The arguments you just heard about the facts simply assume away 61 pages of factual findings when what, as Judge Christen pointed out, has to be done here is to show that the district court's findings were clear error. And its underlying legal theory in this case is that it can suppress all accounts of these protests except for its own. And no court has ever endorsed such a rule because it would be a flagrant violation of the First Amendment and basic democratic principles. Allowing the government to control the news is the hallmark of a dictatorship, and that is exactly what the district court's order prevents. What I would like to do. This is Judge Rawlinson. I just wanted to ask you if you agree with opposing counsel's representation that press has never been exempt from legitimate dispersal orders. I don't agree. There's no First Amendment basis for excluding press from these protests because, as the district court found, there's no danger to law enforcement. There's no threat to federal property that are posed by these individuals. And other district courts around the country have issued similar relief and even broader relief than the modest relief that we asked for in this case, which we believe is under-inclusive of everybody who's standing out there in that forum exercising their First Amendment rights. Counsel, you say there are other court decisions. I only see the Lee case as the case upon which you are relying. Is there any authority since Richmond newspapers to suggest that journalists and or legal observers are constitutionally exempt from general dispersal and riot control orders by law enforcement? It's not that they're generally exempt and other people are subject to the order. It is that they are performing a different activity than what the protesters are performing on that forum. So, for example, the protesters are exercising their right to assemble. They're exercising their right to protest. And what the reporters and legal observers are doing is exercising their right to observe what the government's doing and recording it. And that is a well-established right under Fordyce and under Lee and under the Reed v. Lawrence case as well. And under that... Counsel, what's your strongest case to support the proposition that legal observers enjoy the same First Amendment protections as journalists? Well, the legal observers in this case, Judge Rawlinson, are a very, very small group of people, and they're all very clearly marked. And so... Well, but I'm asking you a broader question, whether or not they come within the rubric of the First Amendment as do press individuals. I'm just curious about whether or not there's a case that specifically puts legal observers into that category of First Amendment protection that's been recognized for journalists. Your Honor, I think the Reed v. Lawrence case deals with a legal observer. The gentleman, Reed, in that case, he worked for an organization who... And the job of that organization was to observe these buffalo hazes and to report on them. And that is very similar to what a legal observer does. For example, the go to the protests, and they look at what's happening, and then they report what they observed back to the ACLU. These are activities that are reporting and observing along the lines of what Fordyce did in the Fordyce case, and it's different, right, than what's going on by the protesters. And that's the finding that the district court made, is that these people are not posing any threat or harm to law enforcement, and it's backed up by substantial evidence. And my colleague didn't really explain that there's 36 unreputed declarations in the record. There's hours and hours of video evidence. There's the statements that local law enforcement made. This is the Portland Police. And it wasn't that they just agreed to an injunction. We went out and got an injunction against them, and they've been following that injunction, and they stipulated to continue that injunction because it's workable, because it's safe for law enforcement. And that is substantial proof that there is a way to police these protests without getting rid of legal observers and journalists. The federal agents were under this injunction for over a month before there was this stay order issued, and they've been unable to that's been posed by this injunction. If you have someone, as Judge Kristen pointed out, who is wearing a press hat and they are throwing rocks, they're gonna be subject under section one of the injunction to arrest because there's probable cause that they're doing something wrong. If they are intermingled in a crowd, as Judge Kristen pointed out, this is paragraph six, they're not going to be liable for, you can't be a human shield under this injunction. And there's very little evidence that the press have done that. The district court amended the TRO to expressly include a provision that said that journalists and legal observers can't block or impede or otherwise do anything to interfere with law enforcement activity. So if there is a lawful order to disperse, and we dispute that the federal agents could give one, but if there was such a thing and they could take whatever lawful actions they wanted to, and if you're a press or a legal observer, you're basically operating at your own risk if you're going to go down and embed in the protest. And for the most part, Judge O'Scanlan? Well, I just was waiting for you to complete your sentence, but I'm not quite sure you responded completely to Judge Rawlinson's question. And I have the same one. I have been looking and I can't find any authority which classifies, quote, legal observers, unquote, in any special first amendment constitutionally protected class. The Reed versus Lawrence case, the person is an observer. Reed is not a journalist. Reed works for an organization that is an environmental activist organization, and his job is to report and record what happened. And he's accorded constitutional protections. Everybody. That's not in the context of a protest or a disturbance where the police have to go in and maintain order. So that's, to me, that's kind of a different scenario than we have here. Yes, Your Honor. It's a slightly different scenario, but the right of access remains. And this is a situation where law enforcement is seeking to close down access, to deny access in the same way that they blocked Laura Lee, who was a photojournalist, from photographing the horse roundup in the same way that they precluded Mr. Reed from observing the Buffalo roundup. And really, the idea of the injunction is it protects activity, and the activity that it protects is this right to record and observe the police. And this is also the click case in the First Circuit, where you had someone who was filming an arrest, and the court said, You never have an excuse. You never have any reason to clear someone away if they're not interfering with law enforcement. He was about 10 feet away, and he was filming it. And that's what the plaintiffs are seeking to do in this case. You could have a regulation that says, Okay, we have a public forum out there on the streets of Portland, and you could have somebody playing tuba, and you could have somebody dancing to the tuba music. But you could have an ordinance that said, No loud noises after 10 p.m., and it might sweep in the person who's playing the tuba, but the person who's dancing could remain there because they're not going to be disturbing anyone. And the point is that they have declared that no First Amendment activities are going to occur on this forum when they don't need to do that. There's ample precedent. What Mr. Kurlikowski said, not only is that he didn't disperse reporters and legal observers in over 200 protests in Seattle that were a lot more chaotic and bigger than the ones that we have here in Portland, but it was safe. It was safe, and nobody has been hurt. There is a perfect track record of safety under this injunction, and if it doesn't interfere with law enforcement, this is an overbroad order that is not narrowly tailored to achieving a substantial government interest. And it's particularly important because the government has their own videographers there on this forum, and they're making the record of these events. And that's in the record of 101, docket number 101-2. They have a public affairs agent who is there taking video and taking photographs, and that's why this is a regulation that is not only unnecessary, it's content and viewpoint based. Well, I wonder really whether any case has gone that far, counsel. I'm wondering also about the right of access concept. Typically, that has been understood, starting with Richmond newspapers, to ensure that the public has the right to access government judicial proceedings of various kinds. And I guess it's been extended under Lee to an announced roundup. But by its definition, a riot is not something that the government, A, sponsors, or number two, can regard as its own creature. It is a response to an invasion of federal property. And I question whether that really comes under the right of access analogy at all. What do you say? Well, we believe that it comes under the right of access analogy because what the plaintiffs in this case are seeking to do is to gain access to this forum to record what the government's doing in the identical way that Laura Lee intended to gain access. But even if the court were to analyze this situation as a regulation of a public forum, you still get to the same result because of a couple of things, Your Honor. The first is we don't even know that you get to a forum analysis because this is a content and viewpoint based regulation. But even if you were to get there, there's no alternative forum for these reporters and observers to operate under. These are contemporaneous events and they can't do their job. The protesters might be able to come back tomorrow. But if you come back tomorrow and you're a reporter, you've missed the story. And this story is important. This is the key inflection point of these protests where the police are confronting the protesters. And somebody needs to be there to document whether these dispersal orders are legal and whether they're being enforced in a proper and constitutional way. And so I have a follow up question if I could ask it. You mentioned Fordyce earlier. Of course, that's the case where the Ninth Circuit recognized a First Amendment right to record police activity in public, not in a police station or in any way that interferes, but activity going on in public. But of course, that right has been explicitly recognized by the First, Third, Fifth, Seventh and Eleventh Circuits. We're not alone in that regard. And I don't know if you're making a distinction between that very well recognized right and your answer to Judge Rollinson's question about other observers, other people out on the street. Do you do you is it your understanding that this case law that I'm referring to is limited to members of the press and not to the public generally? Is that what you're saying? I'm not, Your Honor. This this is a right that everyone has. And the person who did the filming in Glick, the First Circuit case, I believe he may have been a lawyer. And and these whole protests are arising because somebody out there, a citizen, took their cell phone and they recorded the police murdering George Floyd. Everybody has a right to record and observe the police. And so this isn't a this isn't a cabin, right? But this is the right that reporters and legal observers are exercising on this forum that should not be suppressed. Well, in those cases, we didn't have the conflict between a dispersal order in the context of some activity that some people describe as a riot. So we have to against the right of the police to maintain order. So looking at that right in a vacuum doesn't really advance our analysis that much because we don't have to make the balance in a circumstance where there is not a dispersal order in effect. Your Honor, how are we supposed to make that balance? Well, there is balancing under the first prong of press enterprises and and that balancing, for the Globe newspaper case that press enterprises came from, they balanced the right of people who had been victims of sexual crimes versus the right of press to access information in court records. And so there is balancing that goes that goes on and under the sort of lead strand of cases. The district court did that. The district court was very careful to try to protect the ability of law enforcement to police these protests. The Portland police has been doing it for over three months now, very effectively and very safely for them. That is the balance that gets struck. The other balance on the other side, the balance of the equities, is that the government becomes the controller of the news. And that is just antithetical to both the individual rights under the First Amendment, but also the structural protections of the fourth estate. And Lee was very clear on that point, that when you have press out there reporting on the government activities, they're the guardians of the public interest and the courts are the guardians of the press. And that is the protection and the balance that was struck in this injunction. And there really isn't anything in the record that would indicate that this injunction has caused harm to anyone. The federal agents have been under it for a long time and they've been unable to provide any evidence that it caused any injury. If you have somebody who is dressed as press and they're doing something wrong, you can arrest them. If they're interspersed with a crowd, you can take legal actions against people in the crowd. And if they're, you know, they can't act as a human shield. And those are the two principal harms. They described one other incident, and this is in the declaration of FPS 824, where there was a crowd of people, and many of them were marked press and perhaps some of them weren't, but they were all sitting there filming the police. And he felt under this injunction that he shouldn't disperse that crowd. And he didn't. And that was the right answer because there was no harm to the government. There was no harm to anybody. There is a massive public and individualized harm that occurs if you suppress all reporting on these protests. And that's what's happening. Counsel, with respect to the retaliation claim, which is also, I suppose, a separate and second claim within your complaint. When I read that, it occurred to me, this really sounds more like a Bivens action, which I guess you chose not to bring. But assuming that there is a retaliation basis, does this injunction respond to the retaliation claim? What is the relation between your relate to that? So, Judge O'Scanlan, this is an injunction that addresses both the access and the retaliation. The way it addresses retaliation, even if you didn't have an access claim, is you have individuals who are nonviolent, who are simply there recording and observing, and they have been intentionally targeted because they are oppressed. And that is what the court found, and it's supported by Bivens. And he built a buffer around that. And he said, you know, it's a complicated type injunction to say no retaliating. It's basically a follow the law injunction. And what he said is, I'm going to make a broader protection, which he can do. And he said, just don't shoot them. Don't shoot them, don't disperse them, unless it's something illegal, and you have probable cause to arrest them, other than... But how is that responsive to retaliation? Because he found that they were targeted for engaging in their protected First Amendment activities, and he built a protection around them that's going to make sure that they can continue to do that. And he drew a bright line rule, and maybe it's a broader protection than what they might otherwise be entitled to. But it is a reasonable exercise of equitable powers, and it's protective of them. Very well. Anything further? No, Your Honor. Thank you. Thank you very much, counsel. Mr. Joshi, you have some reserve time. Thank you, Your Honor. Just a few points. First, my friend, Mr. Borden, relied very heavily on Bordyce and Lee and Reed. And I think what's interesting about those cases, and all of the other Supreme Court cases we talked about, is that there is no... They don't stand for a principle of special access for an observer or a legal observer or a journalist. The analysis in every single one of those cases was whether there's a public right of access. And so in Press Enterprise 1, Wardeer, Press Enterprise 2, preliminary hearings, Richmond Newspapers, Globe Newspapers, Pell, Houchins, Saxby against Washington Post, Fransburg against Hayes, all of these cases, Reed against Lawrence, Lee against Salazar, the analysis was about the public. Page 900 of Lee, the analysis was whether horse gathers have traditionally been open to the public, whether public access plays a positive role in the functioning of horse gathers. So some of those cases find that, like all the Supreme Court cases, the seven or eight I mentioned, were all brought by media organizations or personnel, and the analysis was whether there's a public right. Sometimes there was, and so then the media got a right. Sometimes there wasn't public access, and so the media didn't get an access. And so I think there simply is no basis for the heart of this particular injunction in paragraph one to give special treatment. The second point I wanna bring is... But counsel, it seems that you're asking... Excuse me, could I follow up on that? Because I think you're exactly right. I don't think those cases are limited to the press's access. I think it's public access, and we look at whether or not at step one of press enterprises, whether that forum has been traditionally been open to the... It says press and public very expressly, but you seem to be arguing for the position that the press is disfavored and has less right to access than any other member of the public. No, Your Honor, and if I left that impression, I apologize. That is not what I wanted to convey. I think the issue here is that we have riots on local assemblies that have turned violent and unpredictable, and so the question is, can police clear the area with dispersal orders in order to protect federal property and personnel? And it doesn't matter, contrary to what Mr. Borden said, what right you're exercising. If it were true that the free press is different from free speech, then all those press enterprises, Brandsburg, etc., would have come out a different way. The fact is, it doesn't matter what right you're exercising. It might be free exercise. It might just be you're out for a stroll and you have a Fourth Amendment right not to be seized. But the point is, if in response to violence, police can clear the area, they have to be able to clear the area of everybody, no matter what right you're exercising. And so I'm not asking for a disfavored treatment for journalists. I'm saying when executive officers have determined in their expert view that the best way to protect safety and balance the public interest in protecting personnel and property from violence in an uncontrollable situation is to clear the crowd, then journalists and legal observers don't have special rights. And under the Supreme Court's decision in winter against NRDC, if you don't have a merits base for the injunction, the injunction can't issue. And for that reason, we urge you to stay the injunction pending appeal. Thank you. The case just argued will be submitted for decision. And we thank counsel for their assistance to this court, especially given the geographic spread that we are we are forced to deal with today. Thank you very much. Thank you, Your Honor. And this court shall adjourn.
judges: O'scannlain, Rawlinson, Christen